UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| BENSON RAY NETHERLAND II, | ) | CAUSE NO. 3:12-CV-310-CAN |
| Plaintiff, | ) | |
| v. | ) | |
| CAROLYN W. COLVIN,[1] Acting Commissioner of the Social Security Administration, | ) | |
| Defendant, | ) | |

**ORDER AND OPINION**

On June 15, 2012, Plaintiff Benson Netherland ("Netherland") filed his complaint in this Court. On November 5, 2012, Netherland filed his opening brief requesting that this Court remand this matter to the Commissioner for calculation of benefits. In the alternative, Netherland seeks reversal of the Commissioner's decision and a remand for a new hearing and decision consistent with the principles outlined in his brief. On February 11, 2013, Defendant, Acting Commissioner of the Social Security Administration, Carolyn W. Colvin ("Commissioner"), filed her response brief. Netherland filed a reply on March 4, 2013. This Court may enter a ruling in this matter based on the parties' consent, 28 U.S.C. § 636(c), and 42 U.S.C. § 405(g).

I. PROCEDURE

On March 9, 2009, Netherland filed for Title II Disability Insurance Benefits ("DIB") and Title XVI Supplemental Security Income ("SSI") pursuant to 42 U.S.C. §§ 416(i), 423 alleging disability beginning on March 6, 2009.[2] (Tr. 162-71). In his application, Netherland

---
[1] On February 14, 2013, Carolyn Colvin became the Acting Commissioner of the Social Security Administration. In accordance with Rule 25(d) of the *Federal Rules of Civil Procedure*, Carolyn W. Colvin, in her official capacity only, is substituted as the defendant in this matter.

[2] The record shows that Netherland previously filed for DIB and SSI. That application was denied on January 11, 2007, with no indication of an appeal. Except for a few medical records, the details of his first application are not discussed further here.

alleged impairments due to symptoms associated with bipolar disease; back, shoulder, and neck pain; and spinal stenosis.[3] (Tr. 217). His claims were initially denied on June 17, 2009, and also denied upon reconsideration on October 5, 2009. (Tr. 73, 82-84). Upon a request, Netherland appeared at a hearing before an Administrative Law Judge ("ALJ") on November 9, 2010. (Tr. 96).

On February 23, 2011, the ALJ issued a ruling that Netherland was not disabled. (Tr. 30). The ALJ found that Netherland met the insured status requirement of the Social Security Act through December 31, 2012. (Tr. 23). The ALJ further found that Netherland had not engaged in substantial gainful activity since March 6, 2009, and his bipolar disorder, lower back pain, shoulder joint arthritis, and rotator cuff problems were severe impairments. (*Id.*). However, the ALJ found that Netherland did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*).

The ALJ found that Netherland retained the residual functional capacity ("RFC") to perform sedentary work as defined in 20 CFR 404.1567(a) except Netherland was not able to perform work that imposed close regimentation of production.[4] (Tr. 25). Some of the limitations outlined by the ALJ include the option to sit or stand while working; no standing or walking longer than 75% of the 8-hour workday; only occasional extreme postures; no lifting or carrying greater than ten pounds occasionally or five pounds frequently; and no work demanding constant manipulation involving fine work, gripping, grasping, twisting, turning, picking, pushing, or pulling with hands or fingers. (Tr. 25-26). The ALJ then found that despite the

---

[3] Spinal stenosis is a narrowing of the open spaces with in one's spine, which can result in pressure on the spinal cord and the nerves that travel throughout the spine. http://www.mayoclinic.com/health/spinal-stenosis/DS00515.

[4] Close regimentation of work activity is a consequence of certain operational demands for functioning within close tolerances or for an unusually rapid level of production. For example, employees in this work face rigid expectations, with close and critical supervision that might be required when there is a high value placed by the employer on the product quality, the raw materials, the equipment employed, or upon coordination with other workers and the pace of production. (Tr. 25).

conclusion that Netherland was unable to perform his past relevant work, there were a significant number of jobs that exist in the national economy in which Netherland could engage. (Tr. 28-29).

On May 16, 2012, the Appeals Council denied Netherland's request for review of the ALJ's decision, making it the Commissioner's final decision. *See Fast v. Barnhart,* 397 F.3d 468, 470 (7th Cir. 2005); 20 C.F.R. § 404.981. On June 15, 2012, Netherland filed a complaint in this Court seeking a review of the ALJ's decision.

## II. ANALYSIS

### A. Facts

Netherland was thirty-five when the ALJ denied his claims. (Tr. 29). He has a high school equivalency diploma (GED) and has performed a long list of unskilled factory and non-factory work. (Tr. 193, 197).

#### 1. Medical Evidence Regarding Physical Impairments

The first indication of physical impairment in the record was on May 12, 2005, when Netherland was treated at Kosciusko Community Hospital for pain between his shoulder blades and lower neck arising from an "unknown injury." (Tr. 315). He reported gradual increasing pain intensity and x-rays showed muscular spasms. (Tr. 317).

Later, in October of 2005, Netherland returned to the Kosciusko Community Hospital, this time to the Emergency Department, seeking treatment for elbow and bilateral shoulder pain and complaints that he had trouble sleeping. Specifically, he said that he had to drink six beers in order to sleep. The treating physician diagnosed chronic tendonitis in the bilateral upper extremities and prescribed a host of pain medications. (Tr. 343-348).

On December 12, 2006, Dr. Jean Perrin evaluated Netherland at the request of the state Disability Determination Bureau ("DDB") in response to Netherland's previous disability application. (Tr. 387). Dr. Perrin diagnosed Netherland with a minor heart condition, and the doctor noted: "In regard to the workplace, there are no physical findings that limit the claimant's ability to do normal work-related activities." (Tr. 390-91). Likewise, in December of 2006, Dr. J Sands, another agency physician, opined that Netherland had no severe physical impairment regarding a disability determination. (Tr. 400).

In early July 2008, Netherland revisited the emergency room at Kosciusko Community Hospital three times in four days. On July 1, he was treated for leg pain he sustained after jumping off a 10 foot retaining wall. (Tr. 420). The very next day he returned with a headache, neck pain, and dizziness with vomiting. After a normal CT scan, he was diagnosed with a headache. (Tr. 425). On July 4, he returned via ambulance when he sustained a head injury after drunkenly climbing and falling into a dumpster. The treating doctor concluded that there were no clear signs of head or neck injury. (Tr. 440-441).

In compliance with a request for follow-up, Netherland began primary care treatment with Northern Lakes Medical Associates. Dr. Bethel Sine, a primary care physician, first evaluated Netherland's complaints of shoulder pain, headaches, and dizziness. Dr. Sine coordinated care and sent Netherland for testing. Netherland then underwent a spinal MRI on July 16 and MRIs on both shoulders on July 21. The impression from the cervical spine MRI revealed a herniated disc, and the shoulder MRI showed moderately inflamed tendons of the rotator cuff and tendonitis or tears. (Tr. 510, 568).

Later that month, Netherland visited Dr. Jeffery Kachmann, a neurologist, upon the referral of Dr. Sine. Dr. Kachmann reviewed the July 16 spinal MRI and suggested that it

4

showed prominent right forward C5-6 disc herniation and cord compression. The doctor recommended operations to the cervical spine, or neck, to address the herniation and compression. (Tr. 479-80).

The next month, Dr. Leo Dean Jansen evaluated Netherland regarding his shoulder problems following a referral from Dr. Sine. Netherland tested positive in the right shoulder on a number of shoulder impingement tests and he showed signs of a loss of range of motion and loss of strength in the left shoulder. X-rays showed shoulder joint arthritis and bilateral chronic impingement changes.[5] Dr. Jansen diagnosed a rotator cuff tear, impingement syndrome, and degenerative arthritis in the right shoulder. Dr. Jansen finally noted that shoulder surgery was the next step. (Tr. 451-54).

Later, in August 2008, Netherland visited treating physician Dr. T.J. Curfman regarding problems with intermittent monocular vision loss associated with nausea and dizziness as well as severe headaches and the mid-cervical disc herniation. The doctor did not make a conclusive diagnosis that day, but dismissed Netherland with aspirin therapy and remarked that he was "doing well." (Tr. 472-73).

Netherland's next point of treatment was on October 24, 2008, when he visited Dr. Vladmir Salomon and Dr. Joseph Fortin at Spine Technology and Rehabilitation seeking treatment for his back, neck, and shoulder. He reported to the doctors that his pain and headaches altered his sleep habits and activities of daily living. He left with further pain medication and diagnoses of rotator cuff tears and joint arthritis in both shoulders, but the doctors made no diagnosis concerning Netherland's cervical disc herniation. (Tr. 659-61).

---

[5] Shoulder impingement syndrome is closely related to shoulder bursitis and rotator cuff tendinitis. http://my.clevelandclinic.org/orthopaedics-rheumatology/diseases-conditions/hic-impingement-syndrome-of-the-shoulder.aspx

Following this initial visit, Dr. Fortin also evaluated Netherland for his shoulder and neck injuries in January, February, and March of 2009. (Tr. 639-53).

At the end of 2008, Netherland underwent a sleep study and then a CPAP titration study at Kosciusko Community Hospital to address his sleep issues. The study revealed that a determined level of positive nasal pressure subdued Netherland's obstructive sleep apnea syndrome and oxygen desaturation, and, as a result, Dr. Manuel Cervoni recommended utilizing a CPAP. (Tr. 488-89).

On May 23, 2009, Netherland went through a Consultative Examination by Dr. Dietrick Gorman at the request of the DDB related to the disability application at issue in this case. Netherland told Dr. Gorman that he could only lift two pounds, that he had not followed through with his doctors' recommendations for shoulder surgery, and that he had not been using his prescribed CPAP. Dr. Gorman concluded that Netherland cooperated in the evaluation and that, if Netherland was being truthful about his symptoms, he had limits in upper extremity movement due to his perceived pain. (Tr. 595-600).

Following the examination by Dr. Gorman, Netherland saw Dr. Managala Hasanadka, another agency physician with the Indiana DDB. Dr. Hasanadka completed a physical RFC assessment form and concluded that Netherland was capable of performing a less than full range of light work. The examiner indicated that Netherland could occasionally lift 20 pounds and frequently lift 10 pounds, stand for six hours in a day and sit for eight, and was unlimited in pushing and pulling. Finally, Dr. Hasanadka expressed that, in his opinion, Netherland was credible and that the primary and secondary diagnoses were, respectively, cervical spinal stenosis and shoulder impingement. (Tr. 603-10).

In June 2009, Netherland returned to see Dr. Jansen, the orthopedic surgeon. Netherland complained of some right hip pain. The doctor suggested that his principal concern was Netherland's thirty pound weight gain in the ten months since his last visit. Dr. Jansen completed X-rays of Netherland's hip and groin, and the doctor remarked that the results were essentially normal and that, aside from long-term treatment, weight loss would "produce dramatic improvements." (Tr. 614-15). In addition to multiple recommendations for surgery to remedy his shoulder and spinal impairments, Netherland's treating physicians commonly prescribed a number of pain medications.

In July and September of 2009, Dr. Fortin commented on Netherland's physical disabilities. In a July 27, 2009, evaluation, Dr. Fortin noted impressions of chronic neck pain and right shoulder pain. (Tr. 636-37). Following that visit, on September 8, 2009, Dr. Fortin wrote a letter to Netherland's attorney concerning the doctor's medical opinion of Netherland's shoulder and neck pain. The doctor diagnosed Netherland with chronic neck pain, right shoulder pain, bilateral rotator cuff tear, and shoulder joint arthritis. Dr. Fortin gave a detailed explanation of Netherland's permanent work restrictions, which included: "no reaching at shoulder level or above. . . , no lifting or push/pull greater than 10 pounds and limited handling of objects. . . in an 8-hour workday he must change from sit/stand/walk every 1 to 2 hours with breaks every 2-3 hours. . . ." (Tr. 712-13).

On October 15, 2009, Dr. Mary McLarnon, an agency physician for the DDB, reviewed Netherland's physical residual functional capacity assessment. Dr. McLarnon mostly agreed with the previously reported opinions. She adjusted Dr. Hasanadka's earlier residual functional capacity opinion on both the exertional and manipulative limitations when she determined that

7

Netherland's limitations related to standing, walking, handling, and fingering worsened over time. (Tr. 699-700).

Finally, on April 4, 2010, Netherland was treated by Dr. Rebecca Johnson of Northern Lakes Internal Medicine due to complaints of migraines that lasted up to 18 hours, shoulder pain, and burning pain down the right arm. Knowing that he had a pending DIB claim, she wrote that she believed he should qualify for benefits. She expressed that Netherland was physically limited to a position where he could mostly sit and change positions frequently. She also suggested that he would be limited to less than 10 pounds of lifting and that he would have to miss 5-10 work days per month due to his migraine and bipolar complications. (Tr. 721). After a follow-up on August 16, 2010, Dr. Johnson wrote a letter dated August 17, 2010, and diagnosed Netherland with 10 "chronic problems." (Tr. 750). The main diagnoses were: 1) chronic AC joint separation of bilateral shoulders and rotator cuff problems with limited range of motion in his upper extremities and 2) spinal stenosis and degenerative disk disease with radicular pain down his right arm. (*Id.*). She suggested that if she were an employer she "would never hire this man" and concluded by saying that he is "unemployable as far as [she] is concerned." (*Id.*).

### B.    Standard of Review

When reviewing an ALJ's decision, the court must determine whether the decision is supported by substantial evidence and is free of legal error. *See* 42 U.S.C. § 405(g) (2006); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005); *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003). "Substantial evidence" is more than mere scintilla of relevant evidence that a reasonable mind might accept to support such a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A reviewing court

is not to substitute its own opinion for that of the ALJ's or re-weigh the evidence, but the ALJ must build a logical bridge from the evidence to his conclusion. *Haynes*, 416 F.3d at 626. The ALJ's decisions cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). However, an ALJ need not provide a "complete written evaluation of every piece of testimony and evidence." *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004) (quoting *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir.1995)). An ALJ's legal conclusions are reviewed *de novo*. *Haynes*, 416 F.3d at 626.

In order to qualify for benefits under the Social Security Act, Netherland must establish that he is disabled. *See* 42 U.S.C. § 423(a)(1)(D). The Social Security Act expressly defines "disability" as an "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations prescribe a sequential five-part test to determine whether a claimant is disabled. An ALJ must consider: (1) whether a claimant is presently employed; (2) whether a claimant has a severe impairment or combination of impairments; (3) whether the severe impairment meets or medically equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether a claimant is unable to perform past relevant work; and (5) whether a claimant is unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).[6]

---

[6] Due to the identical thrust of the regulations covering DIB and SSI, the Court will simply refer to 20 C.F.R. § 404 in the future.

A finding of disability requires an affirmative answer at either step three or step five. *Briscoe*, 425 F.3d at 352. At step three, if a claimant's impairment or combination of impairments meets the criteria listed in the Social Security regulations, the claimant is disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Pt. 404, Subpt. P, App. 1. However, if the impairment does not meet any of the listed criteria, the ALJ will assess the claimant's RFC, which is then used to determine whether the claimant can perform his past work under step four and whether he can perform other work in society under step five. 20 C.F.R. § 404.1520(e)–(g). The claimant has the burden of proof at steps one through four, after which the burden shifts to the Commissioner at step five. *Young*, 362 F.3d at 1000.

### C. Issues for Review

In this case, Netherland raises two major issues for review. First, the Court must determine whether substantial evidence supports the ALJ's finding at step three that Netherland had no impairment or combination of impairments that met or medically equaled those listed in 20 C.F.R. Part 404, Subpart P, App. 1. Netherland specifically argues that the ALJ made an erroneous determination at step three because Netherland adequately demonstrated that his impairments met or equaled in severity listings 1.02 (Major dysfunction of a joint(s)) and 1.04 (Disorders of the spine).[7]

Second, the Court must determine whether the ALJ's RFC determination for Netherland is supported by substantial evidence. Netherland specifically argues that the ALJ made an erroneous RFC determination because he (1) made an improper credibility determination; and (2) failed to include all the limitations identified by doctors and medical consultants. The Court notes that Netherland filed an opening brief that exceeded the page limit established by the local

---

[7] Plaintiff did not challenge the ALJ's unfavorable step three finding regarding mental impairment listings. Consequently, the Court will not address this issue.

rules. *See* N.D. IND. L.R. 7-1(e)(1); 7-3(d). Because Netherland did not seek leave of court to file his excessive brief, the Court **STRIKES** pages 26 and following. [Doc. No. 23]. Undeveloped arguments are waived arguments. *Estate of Moreland v. Dieter*, 395 F.3d 747, 751 (7th Cir. 2005). Therefore, the Court will not acknowledge or address any additional issues raised after page 25. Moreover, any such arguments are deemed waived.

> **1. Substantial evidence does not support the ALJ's finding that Netherland had no impairment or combination of impairments that met or medically equaled a listing in the Listing of Impairments.**

When it is determined that a severe impairment is present in the second step, the third step of sequential analysis is carried out to ascertain whether the impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, App. 1. 20 C.F.R. § 404.1520(d). If the claimant has an ailment that meets or equals an impairment found in the Listing of Impairments, then, under a theory of presumptive disability, the claimant is disabled and is eligible for benefits. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The listings specify the criteria for impairments that are considered presumptively disabling. 20 C.F.R. § 404.1525(a); *see also Barnett v. Barnhart,* 381 F.3d 664, 668 (7th Cir. 2004). A claimant may also achieve presumptive disability by demonstrating that his impairment is associated with symptoms that are equal in duration and severity to those described in a specific listing. 20 C.F.R. § 404.1526(a); *see also Barnett,* 381 F.3d at 668.

Netherland contends that he met his burden of showing that his condition met or equaled in severity the § 1.02(B) listing. Listing 1.02(B) includes major dysfunction of a joint such as a gross anatomical conformity with "involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in an inability to perform fine and gross movements effectively." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.02B. Netherland specifically contends that the MRIs and evaluations performed by Drs. Jansen, Kachmann, and Fortin are

sufficient evidence that his impairments meet the listing because they indicate a gross anatomical conformity. For instance, Dr. Jansen noted that Netherland tested positive in three separate shoulder impairment exams, that he had a 5-7mm cyst on his right shoulder, and that he had a torn rotator cuff. He also points to Dr. McLarnon's comments that indicate markedly limited handling and fingering. In addition, Netherland also relies on Dr. Fortin's conclusion that his physical limitations were becoming more restricted after he examined Netherland's shoulders in September 2009. Furthermore, in the ALJ opinion, the ALJ made it explicit that Dr. Fortin's opinion was given great weight due to the duration and frequency of the interaction between Dr. Fortin and Netherland. Netherland concludes that the above findings signify "gross anatomical conformity defined by impingement lesions, tears, and cysts." Doc. No. 33 at 4.

Regarding his spinal impairment, Netherland argues that he met his burden of demonstrating that his ailment met or equaled in severity the § 1.04(A) listing. The listing includes disorders of the spine including:

> Spinal stenosis. . . resulting in compromise of a nerve root or the spinal cord with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.04A. Here, Netherland points to the record and contends that the July 16, 2008, cervical MRI, which showed a prominent C5-6 disc herniation compressing as well as displacing the anterolateral aspect of the cord at the C5-6 level, was sufficient to meet the § 1.04 listing.

When considering whether a claimant's ailment meets a listed impairment, an ALJ must address the listing by name and offer "more than a perfunctory analysis" of the listing. *Taylor v. Barnhart*, 189 Fed. App'x. 557, 561 (7th Cir. 2006) (quoting *Barnett v. Barnhart*, 381 F.3d 664,

12

668 (7th Cir. 2004)). In this case, the ALJ failed to adequately support his conclusion that Netherland has no impairment or combination of impairments that medically equaled a listing in the Listing of Impairments. As for Netherland's shoulder impairment, the ALJ failed to even identify the § 1.02 listing in his decision. Additionally, while the ALJ did in fact name the § 1.04 listing regarding Netherland's spinal ailment, he merely concluded that Netherland showed no evidence of a listed impairment without any explanation. Oddly, the ALJ found that Netherland's shoulder joint arthritis and rotator cuff problems were severe impairments, but he failed to even mention those shoulder problems when he analyzed the listings. The record contains opinions from a range of physicians who have, in more than one instance, diagnosed Netherland with impingement lesions, tears, and cysts in his shoulders and a disc herniation and cord compression in his spine. While there is admittedly a degree of discrepancy between the doctors' opinions, there is evidence in the record that could be interpreted as meeting a listed impairment. Because the ALJ failed to articulate evidence in support of his analysis, he made it impossible for this Court to determine what evidence he used to reach his conclusion. Thus, the ALJ's analysis of the listings is insufficient.

In her response brief, the Commissioner defended the ALJ's step three decision by asserting that Netherland failed to demonstrate that he met all the requirements of § 1.02B or § 1.04A. The Commissioner pointed to a number of deficiencies in Netherland's argument for meeting a listing, including the agency doctors' opinions that Netherland's impairments did not meet or equal any listed impairment. These counterarguments are seemingly persuasive, but were not raised by the ALJ. By raising them here the Commissioner violated the *Chenery* doctrine, which forbids the Social Security Administration's lawyers from defending an ALJ's decision on grounds that the ALJ himself had not embraced in his opinion. *SEC v. Chenery*

*Corp.*, 318 U.S. 80, 87–88, 63 S.Ct. 454, 87 L.Ed. 626 (1943); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010). Here, the Commissioner merely speculates and creates assumptions about the possible courses of rationale that the ALJ may have used to come to his conclusion. Such speculation is not proper.

For these reasons, the Court concludes that the ALJ did not offer more than a perfunctory review of Netherland's suitability for meeting or not meeting a listing and, additionally, that ALJ failed to build a logical a bridge between the evidence and his conclusion. On remand, the ALJ should discuss why the evidence in the record does or does not meet a listed impairment, specifically impairments 1.02B and 1.04A.

## 2. Substantial evidence supports the ALJ's RFC finding.

Netherland next takes issue with the ALJ's RFC finding. A claimant's RFC indicates his ability to do physical and mental work activities on a sustained basis despite functional limitations caused by any medically determinable impairments and their symptoms, including pain. 20 C.F.R. § 404.1545, 416.945; SSR 96-8 1996. In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the record and cannot ignore evidence that supports a disability finding. 20 C.F.R. § 404.1545; *Goble v. Astrue*, 385 Fed. App'x 588, 593 (7th Cir. 2010) (citing *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009)). The record may include medical signs, diagnostic findings, the claimant's statements about the severity and limitations of symptoms, statements and other information provided by treating or examining physicians and psychologists, third party witness reports, and any other relevant evidence. SSR 96-7p 1996. "Careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone." SSR 96-8p. However, it is the claimant's

responsibility to provide medical evidence showing how his impairments affect his functioning. 20 C.F.R. § 404.1512(c). Therefore, when the record does not support specific physical or mental restrictions on a claimant's work-related activity, the ALJ must find that the claimant has no related functional limitations. *See* SSR 96-8p.

### a. The ALJ's credibility determination was not patently wrong.

Netherland first attempts to refute the ALJ's credibility finding. Netherland argues that, in determining his RFC, the ALJ completed a flawed pain analysis and the ALJ improperly relied on Netherland's noncompliance with prescribed medical treatment. Nevertheless, the ALJ's credibility finding was not patently wrong.

When making an RFC determination, an ALJ must carefully consider the claimant's statements about his symptoms. SSR 96-8p. In assessing a claimant's subjective symptoms, the ALJ must follow a two-part process. SSR 96-7p. First, the ALJ must determine that a medically determinable impairment, shown by acceptable medical evidence, exists and can reasonably be expected to produce the claimant's symptoms. *Id.* Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the impairment to determine the extent to which the symptoms limit the claimant's ability to work. *Id.* When the claimant's statements about his symptoms and limitations are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on considerations of the entire record. *Id.* In determining credibility, infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not demonstrate a sufficient reason for not following medical directions. *Id*. It is well settled that the ALJ is in the best position to assess a claimant's credibility. *See Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir.

2000). Thus, courts afford an ALJ's credibility determination special deference and will only overturn if it is patently wrong. *Shideler v. Astrue*, 688 F.3d 306, 310–11 (7th Cir. 2012).

Netherland first argues that the ALJ's credibility determination is flawed because he failed to take into account Netherland's "very high pain level." Doc. No. 23 at 24. Despite Netherland's argument, the ALJ cited evidence from six physicians regarding Netherland's pain, including opinions that suggested pain on each extreme of the pain intensity spectrum. (Tr. 26-28). Additionally, the ALJ's RFC finding restricted Netherland to sedentary work. (Tr. 25-26). Sedentary work is the most restrictive work type classified by physical exertional requirements in 20 C.F.R. Part 404.1567. Therefore, the ALJ's RFC reflects Netherland's pain. The ALJ also restricted Netherland's RFC further by finding that he is not able to perform work with "operational demands for functioning within close tolerances or for an unusually rapid level of production." (Tr. 25).

Netherland also argues that his lack of insurance and financial resources did not amount to noncompliance. Specifically, he argues that the ALJ should not have drawn a negative inference regarding his failure to comply with medical directives because he did not have insurance to pay for surgery. Netherland's argument fails to recognize that failure to obtain surgery was only part of the ALJ's discussion of noncompliance. The ALJ noted that Netherland was not using his prescribed CPAP. (Tr. 27). He further noted that Netherland did not attend all of his medical appointments. (*Id.*). Therefore, because the ALJ's credibility determination did not lack explanation or support, it is not patently wrong.

      **b.**     **Netherland's argument that the ALJ failed to adequately account for Netherland's physical limitations failed to develop within the 25 page limit.**

16

Netherland argues that the ALJ's RFC determination does not adequately account for Netherland's physical limitations. Specifically, Netherland argues that the ALJ misinterpreted an agency physician's opinion, which supported a more restrictive RFC. Before he could develop a meaningful legal argument, however, Netherland surpassed the 25 page limit imposed by the local rules. *See* N.D. Ind. L.R. 7-1(e)(1); 7-3(d). The Court will not consider any evidence or arguments presented on pages 26 and following, which have already been stricken. Without more, Netherland has not shown that the ALJ's RFC determination failed to account for all of Netherland's physical limitations. As a result, the Court finds that the ALJ's RFC determination was supported by substantial evidence and must stand.

### III. CONCLUSION

This Court concludes that the ALJ made a proper RFC determination in this case. The ALJ's credibility determination was not patently wrong. However, the ALJ failed make the required connection between evidence and conclusion when he found that Netherland did not have an impairment or combination of impairments that met or medically equaled one in the Listing of Impairments. Therefore, Netherland's request for remand is **GRANTED**. [Doc. No. 1]. This Court **REMANDS** the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g).

**SO ORDERED.**

Dates this 1st day of July, 2013.

    S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge